UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 25-0831 JGB (DTBx)** | Date | July 9, 2025 |
|---|---|---|---|
| Title | *Christopher Haro, et al. v. Target Corporation, et al.* | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) DENYING Plaintiffs' Motion to Remand (Dkt. No. 14); and (2) VACATING the July 14, 2025 Hearing (IN CHAMBERS)

Before the Court is Plaintiffs Christopher Haro and Christopher Ruiz's (collectively "Plaintiffs") motion to remand pursuant to 28 U.S.C.A. § 1447. ("Motion," Dkt. No. 14.) The Court determines this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motion, the Court **DENIES** the Motion. The Court **VACATES** the July 14, 2025 hearing.

## I. BACKGROUND

On February 3, 2025, Plaintiff Haro, individually and on behalf of similarly situated individuals, filed a putative class action complaint in the Superior Court of the County of Riverside against defendants Target Corporation ("Target" or "Defendant"), Eato Tanaka, and Does 1 through 100 (collectively, "Defendants"). ("Complaint," Dkt. No. 1-1.) On March 3, 2025, Plaintiffs filed a first amended complaint against Defendants. ("FAC," Dkt. No. 1-4.)

On April 3, 2025, Target removed the action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), and 28 U.S.C. §§ 1441 and 1446. ("NOR," Dkt. No. 1.) In support of its NOR, Target filed the declarations of attorney Alberto Corona ("Corona NOR Decl.," Dkt. No. 1-7) and Defendant's expert Holly Brackin, a principal in the Labor & Employment practice of Charles River Associates ("Brackin Decl.," Dkt. No. 1-8).

The FAC alleges nine causes of action under the California Labor Code and California Business and Professions Code: (1) failure to pay overtime fees, Cal. Lab. Code §§ 1194 and 1199;

(2) failure to pay minimum wages, Cal. Lab. Code §§ 218.6 and 1194; (3) failure to provide meal periods, Cal. Lab. Code §§ 226 and 512; (4) failure to provide rest periods, Cal. Lab. Code § 226; (5) failure to timely pay final wages at termination, Cal. Lab. Code §§ 201-203; (6) failure to provide accurate itemized wage statements, Cal. Lab. Code § 226; (7) failure to indemnify employees for expenditures, Cal. Lab. Code § 2802; (8) violation of California's Quota Law, Cal. Lab. Code §§ 2100, et seq.; and (9) unfair competition and unlawful business practices, Cal. Bus. & Prof. Code §§ 17200, et seq. (hereinafter referred to as "UCL"). (See FAC.) Plaintiffs' UCL claim requests "(an) injunction(s) prohibiting Defendants from further violating the Labor Code and requiring the establishment of appropriate and effective means to prevent further violations, as well as restitution of all wages and other monies owed to [Plaintiffs] under the Labor Code . . . ." (See id. at 33.)

On May 2, 2025, Plaintiffs filed the Motion. (Motion.) In support of the Motion, Plaintiffs filed a declaration of attorney Saima Ali Gipson. ("Gipson Decl.," Dkt. No. 14-1.) On May 27, 2025, Target opposed. ("Opposition," Dkt. No. 21.) In support of its Opposition, Target filed a declaration of its Director of HR Policy & Compliance Michael Brewer ("Brewer Decl.," Dkt. No. 21-1) and a supplemental declaration of its expert Holly Brackin ("Brackin Supp. Decl.," Dkt. No. 21-2). Plaintiffs replied on June 2, 2025. ("Reply," Dkt. No. 22.) In support of their Reply, Plaintiffs filed evidentiary objections to the Brewer Declaration and the Brackin Supplemental Declaration. ("Evidentiary Objections," Dkt. Nos. 23-24.)

On June 5, 2025, the parties stipulated for Plaintiffs to file a second amended complaint (Dkt. No. 25) which the Court approved on June 11, 2025 (Dkt. No. 30). On June 13, 2025, Plaintiffs dismissed Defendant Tanaka from this action pursuant to Federal Rule of Civil Procedure 41(a). ("Tanaka Notice of Dismissal," Dkt. No. 32.) The same day, Plaintiffs filed a second amended complaint, asserting the same causes of action against Target.[1] ("SAC," Dkt. No. 33.)

---

[1] The SAC limited the putative class to only distribution center or warehouse workers and shortened the liability period—amended allegations that may affect this Court's jurisdictional analysis under CAFA. (See SAC at 9-10; FAC at 9-10; Motion at 3.) "Where a defendant removes a case to federal court under CAFA, and the plaintiffs amend the complaint to explain the nature of the action for purposes of our jurisdictional analysis, we may consider the amended complaint to determine whether remand to the state court is appropriate." Benko v. Quality Loan Serv. Corp., 789 F.3d 1111, 1117 (9th Cir. 2015). Accordingly, for the purposes of this Motion, the Court considers the allegations contained in both the FAC and the SAC. Plaintiffs further assert that Defendant entirely based its Opposition on the FAC when Target's NOR relied on allegations contained in the Complaint. (See Reply at 1 ("Indeed, Defendant's Notice specifically acknowledges that while a First Amended Complaint [] was filed prior to Defendant's Notice of Removal, it was not served upon Defendant.").) However, besides declaring that "neither the language of the operative complaint nor the FAC would support a finding of $5 million in amount-in-controversy to meet the CAFA jurisdictional requirement," Plaintiffs do not expound on that argument; therefore, the Court will not consider it. (See id.)

## II.     FACTUAL ALLEGATIONS

Plaintiff Haro worked as a non-exempt employee of Defendant from approximately August 2014 through November 2024. (FAC ¶ 2.)  Haro's duties included, but were not limited to, operating forklifts, loading and unloading shipments, and general warehouse tasks subject to production targets and quotas. (Id.)

Plaintiff Ruiz is a non-exempt employee of Defendant since approximately May 2019. (Id. at 3.)  Ruiz's duties include checking customers' orders, checking damaged equipment, communications with vendors, and a sundry of warehouse duties subject to production targets and quotas. (Id.)

Under Target's quotas, Plaintiffs were assigned or required to perform at a specified productivity speed, perform a quantified number of tasks, or to handle or produce a quantified amount of material, within a defined time period, under which they suffered adverse employment actions if they failed to meet the prescribed performance standards. (Id. at 2-3.)

Plaintiffs bring this action on behalf of themselves, and similarly situated individuals. (SAC ¶ 25.)  The proposed class is defined as follows:

> General Class: . . . all current and former non-exempt distribution or warehouse workers of [Target] within the State of California at any time commencing from December 11, 2023 up until the time that notice of the class action is provided to the class . . .
>
> Quota Class: . . . all current and former non-exempt distribution or warehouse workers of [Target] within the State of California at any time commencing January 1, 2022 up until the time that notice of the class action is provided to the class . . . .

(Id.)

Plaintiffs allege that Defendant failed to: pay for all hours worked (including minimum, regular, overtime, and double times wages); provide legally compliant meal and rest periods; timely pay all final wages upon termination; furnish accurate itemized wage statements; and indemnify for work-related expenditures. (Id. ¶¶ 14–24; FAC ¶¶ 15-25.)  Target also implemented an unlawful quota policy and practice and consistently failed to provide Plaintiffs with the rights guaranteed to them under the Healthy Workplace Heathy Families Act of 2014 and comply with the California Labor Code. (SAC ¶¶ 21-22, 41, 50-59, 139; FAC ¶¶ 22-23, 42, 51, 131.)

//
//
//

## III.     LEGAL STANDARD

"CAFA gives federal district courts original jurisdiction over class actions in which the class members number at least 100, at least one plaintiff is diverse in citizenship from any defendant, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs." Ibarra v. Manheim Investments, Inc., 775 F.3d 1193, 1195 (9th Cir. 2015). "In determining the amount in controversy, courts first look to the complaint. Generally, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." Id. at 1197 (quotations omitted). "Whether damages are unstated in a complaint, or, in the defendant's view are understated, the defendant seeking removal bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million when federal jurisdiction is challenged." Id.

Where a plaintiff makes a factual attack in the context of CAFA jurisdictional requirements, defendants are required to support their jurisdictional allegations with proof typically considered at summary judgment. A factual attack "contests the truth of the . . . allegations" themselves. Id. (citation omitted). "When a plaintiff mounts a factual attack, the burden is on the defendant to show, by a preponderance of the evidence, that the amount in controversy exceeds the $5 million jurisdictional threshold." Id. (quoting Ibarra, 775 F.3d at 1197). A factual attack "need only challenge the truth of the defendant's jurisdictional allegations by making a reasoned argument as to why any assumptions on which they are based are not supported by evidence." Harris, 980 F.3d at 700 (citing Ibarra, 775 F.3 at 1199 (finding that it is sufficient to "contest[ an] assumption" without "assert[ing] an alternative [assumption] grounded in real evidence")).

A defendant is required to file a notice of removal that includes only "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." Dart Cherokee Basin Operating Co. v. Owens, 574 U.S. 81, 88 (2014). However, if a plaintiff contests these allegations, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." Id. The preponderance of the evidence standard requires that "the defendant must provide evidence establishing that it is more likely than not that the amount in controversy exceeds that amount." Sanchez v. Monumental Life. Ins. Co., 102 F.3d 398, 404 (9th Cir. 1996) (internal quotations omitted). The parties "may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of the removal." Ibarra, 775 F.3d at 1197 (internal quotations and citation omitted). "[A] defendant cannot establish removal jurisdiction by mere speculation and conjecture, with unreasonable assumptions." Id.

"CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." Id. at 1198. "As with other important areas of our law, evidence may be direct or circumstantial. In either event, a damages assessment may require a chain of reasoning that includes assumptions. When that is so, those assumptions cannot be pulled from thin air but

need some reasonable ground underlying them." Id. at 1199. "Under the preponderance of the evidence standard, if the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction." Id.

Under certain circumstances, attorneys' fees may also be included in the amount in controversy. "[I]f the law entitles the plaintiff to future attorneys' fees if the action succeeds, then there is no question that future attorneys' fees are at stake in the litigation, and the defendant may attempt to prove that future attorneys' fees should be included in the amount in controversy." Fritsch v. Swift Transp. Co. of Ariz., 899 F.3d 785, 794 (9th Cir. 2018) (internal quotations, brackets, and citation omitted). However, "a court's calculation of future attorneys' fees is limited by the applicable contractual or statutory requirements that allow fee-shifting in the first place." Id. at 796.

## IV.     DISCUSSION

Plaintiffs argue that (1) Target failed to prove by a preponderance of the evidence that the amount in controversy for the putative class exceeds the $5,000,000 CAFA jurisdictional minimum and (2) this Court does not have equitable jurisdiction over Plaintiffs' UCL claim. (See Motion at 1.) The Court addresses these arguments in turn.

### A. Amount in Controversy

In its NOR, Defendant asserts that the amount in controversy ("AIC") requirement under CAFA is independently satisfied by Plaintiffs' fifth cause of action—waiting time penalties. (NOR ¶ 35.) Specifically, during 2024 alone, Defendant terminated at least 1,563 full-time, nonexempt employees from its California distribution centers. (Id. ¶ 38; Brackin Decl. ¶ 7.) "Assuming an average shift length of eight hours and using the $16 minimum wage in effect in 2024 for employers with more than 26 employees, as a conservative estimate, the amount in controversy for Plaintiff[s'] waiting time penalty alone is at least $6,001,920 (i.e., 1,563 former employees X $16 per hour X 8 hours per day X 30 days = $6,001,920)." (NOR ¶ 38; Brackin Decl. ¶ 11.) Further, in its Opposition, Target contends its "evidence establishes that the amount placed in controversy by Plaintiffs' *waiting time penalty claim alone*, plus derivative attorney's fees,[2] puts ***at least $10,848,000*** in controversy, even if we limit the analysis just to

---

[2] Plaintiffs assert that because "Defendant specifically chose not to include[, in its NOR,] a calculation for attorneys' fees to demonstrate the $5 million CAFA amount-in-controversy requirement was met," it "cannot now attempt to amend its Notice with calculations that were never included in the original removal." (See Reply at 6.) However, a "notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold; the notice need not contain evidentiary submissions." See Dart Cherokee Basin Operating Co., LLC, 574 U.S. 81, 89 (2014). Evidence establishing the amount in controversy is required "only when the plaintiff contests, or the court questions, the defendant's allegation." Id. In the NOR, Defendant states that "Plaintiif[s] seek[] to recover attorneys' fees" and (continued . . . )

terminations occurring between January 2024 and April 2025." (Opposition at 1 (emphasis in original).)

"[T]he Court must decide, based upon evidence submitted, whether the amount in controversy requirement has been satisfied by a preponderance of the evidence." Torrez v. Freedom Mortg., Corp., 2017 WL 2713400, at *3 (C.D. Cal. June 22, 2017). "[A] defendant may establish the amount in controversy by relying on admissible statistical evidence taken from a representative sample and extrapolated to calculate the potential liability for the full class." Duberry v. J. Crew Grp., Inc., 2015 WL 4575018, at *2 (C.D. Cal. July 28, 2015) (citing LaCross v. Knight Transp. Inc., 775 F.3d 1200, 1202–09 (9th Cir. 2015)). However, a defendant is "not required to comb through the records to identify and calculate the exact frequency of violations." Salcido v. Evolution Fresh, Inc., 2016 WL 79381, at *6 (C.D. Cal. Jan. 6, 2016). "Defendant has no obligation . . . to support removal with production of extensive business records to prove or disprove liability and/or damages with respect to plaintiff or the putative class members at this premature (pre-certification) stage of the litigation." Ray v. Wells Fargo Bank, N.A., 2011 WL 1790123, at *6 (C.D. Cal. May 9, 2011). Where "a defendant must prove the amount in controversy by a preponderance of the evidence, a declaration or affidavit may satisfy the burden." Id.

To calculate the AIC, Defendant relies on three declarations: one from Brewer and the two from Brackin. (See NOR; Brackin Decl.; Brewer Decl.; Brackin Supp. Decl.) Brackin declares that she reviewed hire and termination date information and timekeeping data for all Target non-exempt distribution center employees in California between January 1, 2024 and April 3, 2025 to determine the following:

- There were approximately 3,041 putative class members hired on or after January 1, 2024 and terminated on or before April 3, 2025.
- There were approximately 2,260 putative class members hired on or after January 1, 2024, terminated on or before April 3, 2025, and who were employed by Target for a minimum of 30 days (hereinafter referred to as "Removal Putative Class Member(s)").
- Using an employee-weighted average, the average number of hours worked by the Removal Putative Class Members per employee per day across all distribution centers is 9.17 hours. To calculate this number, Brackin averaged each employee's individual daily hours worked, and then averaged that result across all employees.
- When calculating the potential waiting-time penalties, Brackin used eight hours as an average shift length (in comparison to the 9.17 hours calculated from the data).

---

although Defendant "did not factor [that] into its amount in controversy[, for purposes of the notice,]" the "CAFA's jurisdictional requirement . . . is easily satisfied in this action." (See NOR ¶ 39.) The Court finds that Target is not attempting to amend the notice of removal by adding a new basis for removal jurisdiction; instead, Target submits evidence to support its assertion that, with or without attorneys' fees, the AIC exceeds $5,000,000.

- Brackin used the 2024 California statutory minimum wage of $16 per hour, which was applicable to employers with 26 or more employees.
- Brackin estimates the amount in controversy related to the waiting time penalties claim for the Removal Putative Class Members is at least $8,678,400. Brackin calculated this number by multiplying 2,260 Removal Putative Class Members by the minimum wage in effect for employers of 26 employees or more, by an 8-hour shift, and by thirty days (i.e., 2,260 Removal Putative Class Members x $ 16 per hour x 8 hours per day x 30 days = $8,678,400).

(Brackin Supp. Decl. ¶¶ 6-12, 14.)

Plaintiffs counter that Defendant has not established the requisite AIC pursuant to CAFA. At the outset, Plaintiffs argue that the Brewer and Brackin Declarations should be disregarded because they lack foundation and personal knowledge and rely unauthenticated documents. (See Motion at 6-8; Reply at 7-9; Evidentiary Objections.) Plaintiffs further assert that Defendant (1) potentially incorporates putative class members with released claims pursuant to a related action's settlement agreement; (2) assumes that a hundred percent of all former employees in 2024 are owed waiting time penalties when the FAC contains allegations that "some" employees experienced certain California Labor Code violations "at times"; and (3) makes no attempt to independently calculate Plaintiffs' actual, and likely recoverable, future attorneys' fees. (See Motion at 8-12; Reply at 1, 3-6.)

   1. **Brewer and Brackin Declarations**

Plaintiffs assert that the Brewer and Brackin Declarations are not competent evidence because they contain, without any showing of foundational facts or personal knowledge, unsubstantiated assumptions. (See Motion at 6-8; Reply at 7-9; Evidentiary Objections.) Additionally, Plaintiffs argue that Brackin's credibility should be questioned because she changes material figures in her Declarations that "result in inflating the amount-in-controversy by over $4 million dollars." (See Motion at 2, 9.)

Brackin declares that she is a principal in the Labor & Employment practice of Charles River Associates ("CRA"), with over 25 years of experience in data collection and analysis and advising with respect to wage and hour issues. (Brackin Supp. Decl. ¶ 5.) In the course of her work, Brackin routinely analyzes large databases and performs various statistical analyses and calculations. (Id.) On May 20, 2025, Brackin received various files via a secure file transport message from Michael Brewer, Target's Director of HR Policy & Compliance. (Id. ¶ 6.) Brackin is informed and believes that (1) the "Terms" and "Term Report" data (i.e., "Termination Data") she received from Brewer contains the names, last known hire date, and termination date information for all Target California non-exempt distribution center employees between January 1, 2024 and April 3, 2025; (2) the "CA Punch Data" and "CA Punch Details" data (i.e., "Timekeeping Data") contains the names and the daily timekeeping data for all Target California non-exempt distribution center employees between January 1, 2024 and April 3, 2025; (3) Target had a total of nine distribution centers in California in operation at some point between

January 1, 2024 and April 3, 2025; and (4) the files she received from Brewer contained data for Target California non-exempt distribution center employees between January 1, 2024 and April 3, 2025 at all nine distribution centers. (Id. ¶¶ 7-9.)

Moreover, Brewer declares that he is the Director of HR Policy & Compliance at Target since February 2024. (Brewer Decl. ¶ 2.) In his role, Brewer is familiar with Target's wage-and-hour policies and practices, timekeeping and payroll systems, and operations in California. (Id.) Brewer has access to Target's California employee data records, including employee punch (i.e. timekeeping data), termination data, and personnel records such as employment history, and is familiar with business records related to Target. (Id.) Brewer confirms that between January 1, 2024 and April 3, 2025, Target operated nine distribution centers in California. (Id. ¶ 4.) Target always paid at least the applicable minimum wage to its California distribution center non-exempt employees, which in 2024 was sixteen dollars per hour. (Id. ¶ 5.) At his direction and supervision, Brewer's team pulled the Termination and Timekeeping Data, which he sent to Brackin on May 20, 2025. (Id. ¶¶ 6-9.)

The Court finds that Brackin's analysis of Target's business records "is the type of analysis that courts routinely rely on experts to provide." See Cabrera v. S. Valley Almond Co., LLC, 2021 WL 5937585, at *4 (E.D. Cal. Dec. 16, 2021); see also Marez v. Bassett, 2011 WL 13213813, at *3 (C.D. Cal. Oct. 3, 2011) (finding that expert analysis of business records was admissible and did not constitute legal conclusions). Any doubts related to foundation, personal knowledge, and authentication is addressed by the Brewer Declaration. See Torrez v. Freedom Mortg., Corp., 2017 WL 2713400, at *3 (C.D. Cal. June 22, 2017) (finding that a declaration provided an adequate foundation because the declarant specified his position in the company and stated that he has access to certain employee-related information, which he accesses through his regular course of business activities). Regardless, there is no requirement that evidence be in admissible form on a motion to remand, so long as it is reliable and relevant and could be made admissible at trial. See Darrough v. SOC LLC, 2021 WL 725159, at *1 (D. Nev. Jan. 28, 2021) (citing Fraser v. Goodale, 342 F.3d 1032, 1036–37 (9th Cir. 2003)). Moreover, Federal Rule of Evidence 702 permits non-scientific expert testimony if it rests upon a reliable foundation, as demonstrated by the expert's knowledge and experience. See Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1018 (9th Cir. 2004). Here, Brackin's over twenty-five years of experience in data collection and analysis and advising with respect to wage and hour issues is more than sufficient knowledge and experience. (See Brackin Supp. Decl. ¶ 5.) Finally, contrary to Plaintiffs' assertions, the Brackin Declarations do not change material figures without explanation. (See Opposition at 4 n.1 (asserting that "[i]n Target's original Notice of Removal, Target established that '[d]uring 2024 alone, Defendant terminated at least 1,563 full-time, non-exempt employees from its California distribution centers'" but that "Target has analyzed its full data in support of its Opposition to Plaintiffs' Motion, resulting in a larger number of terminated Putative Class Members") (citing and quoting Brackin Decl. ¶ 38); Reply at 9.)

In sum, the Court has no reason to doubt, based on information currently available, that the business records furnished by Brewer and provided to Brackin, are reliable as to the scope of Target's operations of its warehouse and distribution centers and the size of its employee

population in California during the relevant time. Plaintiffs' Evidentiary Objections are therefore **OVERRULED**.

### 2. Waiting Time Penalties (Claim Five)

Defendant asserts that Plaintiffs' waiting time penalties place $8,678,400 in controversy. (See Opposition at 6-13.) To reach this figure, Defendant narrows the putative class to employees whose claims do not overlap with those in the related action: employees hired on or after January 1, 2024, terminated before April 3, 2025, and employed by Target for a minimum of 30 days (i.e., Removal Putative Class Members). (See id. at 4; Brackin Supp. Decl. ¶ 10.) Brackin declares that there are approximately 2,260 such Removal Putative Class Members. (See Opposition at 4; Brackin Supp. Decl. ¶ 10.) Then, "[u]sing the same average daily hours figure of 8 hours worked per day (which is lower than the actual figure) and using the lowest minimum wage for the period as the basis for the calculation, the amount in controversy for Plaintiffs' waiting time penalty claim comes to at least $8,678,400 (2,260 Removal Putative Class Members x 8 hours/day x $16/hour x 30 days = $8,678,400)." (See Opposition at 13; Brackin Supp. Decl. ¶ 14.)

Pursuant to California law, a discharged employee is generally entitled to receive all wages owed to them immediately upon termination or within 72 hours of resignation. See Cal. Lab. Code § 201(a)-(b). If the employer does not pay wages due immediately, then the employee is entitled to recover waiting time penalties "from the due date thereof at the same rate until paid or until an action therefor is commenced," for up to 30 days. Cal. Lab. Code § 203(a).

Waiting time claims are derivative of other claims. Accordingly, if any putative class member was not paid for all hours worked at any time during their employment, or if the employee experienced a rest break or meal period violation, and if Defendant failed to remedy those violations immediately upon the termination or resignation of the employee, then the putative class member is entitled to receive up to 30 days' worth of pay. See Wilcox v. Harbor UCLA Med. Ctr. Guild, Inc., 2023 WL 5246264, at *4 (C.D. Cal. Aug. 14, 2023).

Plaintiffs argue that it is unreasonable for Defendant to assume "a 100% violation rate of waiting time penalties" for each Removal Putative Class Member. (See Reply at 5.) However, "[t]o the extent that [Plaintiffs] seek[] to skirt the amount in controversy by arguing that Defendant[] committed infrequent or ad hoc violations, the Court is unpersuaded—if [Plaintiffs] do[] not believe that the alleged violations were widespread or regular, then this action is not appropriate for class-wide relief, and [Plaintiffs] should not have asserted [their] claims on behalf of a putative class." See Valero v. MKS Instruments, 2025 WL 72171, at *3 (C.D. Cal. Jan. 8, 2025).

To be entitled to recover waiting time penalties, each putative class member need suffer only ***one*** of the other injuries alleged in the FAC. And for a putative class member to recover 30 days' worth of his or her salary, the injury need only have lasted for more than 30 days—which is necessarily true if, as Plaintiffs allege, the Labor Code violations remain ongoing. (See FAC ¶¶

120-22, 124, 127-28 (alleging an ongoing policy and practice of a quota system that "prevented Plaintiffs and Putative Class Members from complying with California's meal period laws[, or taking breaks, etc.]").) Put differently, the 100% violation rate is not only reasonable—it is a necessary condition of Plaintiffs' decision to file this putative class action case. See Demaria v. Big Lots Stores - PNS, LLC, 2023 WL 6390151, at *7 (E.D. Cal. Sept. 29, 2023) ("Based on Defendants' assumptions regarding the minimum wage and meal and rest break violations, which the Court has found to be reasonable, it is also reasonable to assume all or nearly all employees in the class would be entitled to recovery of waiting time penalties."); Noriesta v. Konica Minolta Bus. Solutions U.S.A., 2019 WL 7987117, at *6 (C.D. Cal. June 21, 2019) (holding that if "Defendant had a 'pattern and practice' of refusing to grant meal and rest breaks or pay class members for all hours worked, then it is likely that all or nearly all class members experienced [waiting time] violations"); Lopez v. Aerotek, Inc., 2015 WL 2342558, at *3 (C.D. Cal. May 14, 2015) (finding that a defendant "properly used a chain of reasoning based on the Complaint to conclude that the amount-in-controversy requirement is met in this case" and the plaintiff "does not assert or suggest an alternative violation rate on which the Court should rely" "although [they were] afforded the opportunity to do so on this motion"). Accordingly, the Court finds that Defendant's estimates regarding the amount in controversy with respect to waiting time penalties are reasonable.

### 3. Attorneys' Fees

The Court need not decide the amount of attorneys' fees at stake because the waiting time penalties are enough to meet CAFA's jurisdictional threshold. However, the Ninth Circuit has held that when, as here, the "underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy." See Galt G/S v. JSS Scandinavia, 142 F.3d 1150, 1156 (9th Cir. 1998). Typically, a "[p]laintiff would recover the benchmark rate of 25 percent of the potential damages in class actions." See Lopez, 2015 WL 2342558, at *3; Valero, 2025 WL 72171, at *5 (finding it reasonable to assume that attorneys' fees equal twenty-five percent of the amount in controversy); Greene v. Harley-Davidson, Inc., 956 F.3d 767, 774 n.4 (9th Cir. 2020) (same). Therefore, Defendant has demonstrated by a preponderance of the evidence that the amount in controversy here exceeds $5,000,000.

### B. Equitable Jurisdiction—UCL Claim

Plaintiffs next contend that this Court lacks equitable jurisdiction over their claim for equitable relief under the UCL. (See Motion at 13-14.) Equitable jurisdiction, much like subject matter jurisdiction, is a limitation on federal courts. See Schlesinger v. Councilman, 420 U.S. 738, 754 (1975). Equitable jurisdiction is concerned with "whether consistently with the principles governing equitable relief the court may exercise its remedial powers." Id. Although equitable jurisdiction is distinct from subject matter jurisdiction, both are "antecedent to hearing a claim on the merits." Guthrie v. Transamerica Life Ins. Co., 561 F. Supp. 3d 869, 874 (N.D. Cal. 2021). Therefore, whenever a federal court is presented with an equitable claim, it must first

determine whether it possesses equitable jurisdiction before it can address the merits. See Guzman v. Polaris Indus., 49 F.4th 1308, 1314 (9th Cir. 2022).

Plaintiffs argue that they seek a legal remedy in the form of monetary damages that is identical to their claim for equitable restitution of unpaid wages owed under the UCL, and a plaintiff in federal court "must, at a minimum, plead that he lacks adequate remedies at law if he seeks equitable relief." (See Opposition at 13 (quoting and citing Guthrie, 561 F. Supp. 3d at 875).) However, "[e]quitable jurisdiction is distinct from subject matter jurisdiction, although both are required for a federal court to hear the merits of an equitable claim." See Treinish v. iFit Inc., 2022 WL 5027083, at *4 (C.D. Cal. Oct. 3, 2022); Guzman v. Polaris Indus. Inc., 2022 WL 4543709, at *5 (9th Cir. Sept. 29, 2022); Schlesinger v. Councilman, 420 U.S. 738, 754 (1975) ("the question of equitable jurisdiction, [is] a question concerned, not with whether the claim falls within the limited jurisdiction conferred on the federal courts, but with whether consistently with the principles governing equitable relief the court may exercise its remedial powers").

Even if the Court lacks equitable jurisdiction over Plaintiffs' UCL claim, it must deny the Motion. See Lee v. Am. Nat. Ins. Co., 260 F.3d 997, 1002 (9th Cir. 2001) ("there is original jurisdiction, and therefore removal jurisdiction under 28 U.S.C. § 1441(a), over a case as long as there is subject matter jurisdiction over one or more of the claims alleged" and "a district court may not . . . remand a case in its entirety where there is subject matter jurisdiction over some portion of it"). Here, CAFA provides subject matter jurisdiction, and the plain language of the removal statute only authorizes remand for lack of subject matter jurisdiction. See 28 U.S.C. § 1447(c); see also Jinhui Kim v. Walmart, Inc., 2023 WL 196919, at *2 (C.D. Cal. Jan. 13, 2023) ("Remand is inappropriate because diversity jurisdiction exists, and the Court's authority to hear this case does not depend on its equitable powers."); Valero, 2025 WL 72171, at *6 ("declin[ing] to remand the entire action based upon its lack of equitable jurisdiction over the UCL claim"). Moreover, the case Plaintiffs largely rely on, Guthrie, is distinguishable from the matter at hand because only equitable claims were at issue in that case, and therefore remand was the only option for those claims to be heard at all. See Guthrie, 561 F. Supp. 3d at 875. Accordingly, the Court **DENIES** the Motion on this basis. Instead, the availability of equitable jurisdiction is best suited for determination via a motion to dismiss. See Treinish v. iFit Inc., 2022 WL 5027083, at *4 (finding that the equitable jurisdiction arguments over a UCL claim "can be made on the motion to dismiss").

## V. CONCLUSION

For the reasons above, the Court **DENIES** the Motion. The July 14, 2025 hearing is **VACATED**. The Court **DENIES AS MOOT** the parties' request to appear remotely at the July 14, 2025 hearing (Dkt. Nos. 26, 28).

**IT IS SO ORDERED.**